Robert V. Prongay (SBN 270796)
  *rprongay@glancylaw.com*
Pavithra Rajesh (SBN 323055)
  *prajesh@glancylaw.com*
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

Matthew M. Houston
  *mhouston@glancylaw.com*
Benjamin I. Sachs-Michaels
  *bsachsmichaels@glancylaw.com*
**GLANCY PRONGAY & MURRAY LLP**
712 Fifth Avenue, 31st Floor
New York, New York 10019
Telephone: (212) 935-7400

Attorneys for Plaintiff Jesse Lowe

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE LOWE, Derivatively on Behalf of Nominal Defendant WRAP TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> MARC THOMAS, THOMAS P. SMITH, JAMES A. BARNES, MICHAEL ROTHANS, SCOT J. COHEN, PATRICK KINSELLA, DAVID NORRIS, MICHAEL PARRIS, and WAYNE R. WALKER, <br><br> Defendants. | Case No. <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Jesse Lowe ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Wrap Technologies, Inc. ("Wrap" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), insider trading (*i.e. Brophy* claim), and contribution for violations of Section 10(b) of the Exchange Act. Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Wrap with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      Wrap is a security technology company whose sole product is the BolaWrap, a remote restraint device marketed as remote handcuffs to restrain subjects from a distance without relying on pain compliance tools.  In December 2019, the Company announced that the Los Angeles Police Department ("LAPD") would train its officers on the BolaWrap and deploy 200 devices in the field for a 90-day pilot program beginning in January 2020.

2.      On July 22, 2020, White Diamond Research published a report alleging that the BolaWrap had limited use in the field and therefore Wrap has a very small total addressable market.  The report also alleged that it was likely Wrap did not secure a contract with the LAPD.

3.      On this news, the Company's share price fell $0.55, or 4.6%, to close at $11.34 per share on July 22, 2020, on unusually heavy trading volume.

4.      On August 25, 2020, after the market closed, an article by *Los Angeles Times* reported that "[s]ince the initial 180-day pilot began in February, LAPD

officers have used the BolaWrap a total of nine times[, and it] was deemed 'effective' in six instances."  As a result, the LAPD sought a 180-day extension to continue evaluating the device.

5.      On this news, the Company's share price fell $0.50, or 5.7%, to close at $8.27 per share on August 27, 2020, on unusually heavy trading volume.

6.      On September 23, 2020, White Diamond Research published a second report, alleging that, despite previously touting the LAPD pilot program, Wrap failed to disclose the key findings from the initial 180-day testing period because it was "bad news."  The report described the nine incidents in which the BolaWrap had been used, thereby highlighting its limited utility.

7.      On this news, the Company's share price fell $2.07, or 25%, close at $6.07 per share on September 23, 2020, thereby damaging investors.

8.      These revelations precipitated the filing of a securities class action in this District against Wrap and certain of its officers and directors, captioned *In re Wrap Technologies, Inc. Securities Exchange Act Litigation*, Case No. 2:20-cv-08760 (the "Securities Class Action").

9.      Plaintiff did not make a litigation demand prior to filing this action because such demand would have been futile based upon the composition of the Board and the actions taken by the Board.  The Board is currently composed of five members, all of whom are named in this action.  As alleged herein, defendant Norris, as Chief Executive Officer ("CEO") knowingly issued misleading statements, the three members of the Audit Committee should have known the material shortcomings of the Company's sole product and the resulting impact on Wrap's financial results. Moreover, defendant Cohen is not independent because he founded the Company with a relative of defendant Norris.  Thus, more than half the members would be interested in a demand to investigate their own wrongdoing.

## II.   JURISDICTION AND VENUE

10.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Sections 10(b) and 14(a) of the Exchange Act.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

11.   Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## III.   PARTIES

**Plaintiff**

12.   Plaintiff Jesse Lowe purchased 50 shares of Wrap stock in January 2020 and has continuously owned his Wrap stock since that date. He currently holds 683 shares.

**Nominal Defendant**

13.   Nominal Defendant Wrap is a Delaware corporation with its principal executive offices located at 1817 West 4th Street, Tempe, Arizona 85281.  The Company's common stock trades on the NASDAQ exchange under the symbol "WRTC."

**Defendants**

14.   Defendant Marc Thomas ("Thomas") served as the Company's Chief Executive Officer ("CEO") from July 30, 2020 to October 27, 2020.  He currently serves as the Company's Chief Government Affairs Officer ("CGAO").

15.   Defendant Thomas P. Smith ("Smith") has served as the Company's interim CEO since October 27, 2020 and as President since March 2019.

16.    Defendant James A. Barnes ("Barnes") is a co-founder of Wrap.  He has served as the Company's Chief Financial Officer since March 2017 and as Secretary and Treasurer since January 2018.  He also served as President from March 2017 to January 2018 and as a director from March 2017 to November 14, 2018.

17.    Defendant Michael Rothans ("Rothans") has served as the Company's Chief Operating Officer ("COO") since November 2018.  In July 2020, his title was renamed Chief Strategy Officer ("CSO").

18.    Defendant Scot Cohen ("Cohen") is a co-founder of Wrap.  He has served as the Company's Executive Chair since July 2017.

19.    Defendant Patrick Kinsella ("Kinsella") has served as a director of the Company since November 2018.  He is Chair of the Audit Committee.

20.    Defendant David Norris ("Norris") has served as a director of the Company since January 2018.  He served as Wrap's CEO from December 2018 to July 30, 2020.

21.    Defendant Michael Parris ("Parris") has served as a director of the Company since November 2017.  He is a member of the Audit Committee.

22.    Defendant Wayne Walker ("Walker") has served as a director of the Company since November 2018.  He is a member of the Audit Committee.

23.    The defendants named in ¶¶ 14-22 are sometimes referred to hereinafter as the "Individual Defendants."

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

24.    By reason of their positions as officers, directors, and/or fiduciaries of Wrap and because of their ability to control the business and corporate affairs of Wrap, at all times, the Individual Defendants owed Wrap and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Wrap in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best

interests of Wrap and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Wrap and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

25.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Wrap, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Wrap, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

26.    To discharge their duties, the officers and directors of Wrap were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Wrap were required to, among other things:

(a)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)    Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

# V.   SUBSTANTIVE ALLEGATIONS

## A.   Background

27.   Wrap is a security technology company whose sole product is the BolaWrap, a remote restraint device marketed as remote handcuffs to restrain subjects from a distance without relying on pain compliance tools.

28.   In December 2019, the Company announced that the LAPD would train its officers on the BolaWrap and deploy 200 devices in the field for a 90-day pilot program beginning in January 2020.   A memorandum from the LAPD Chief of Police, Michel R. Moore, guided officers on the use of BolaWrap:

> Officers may deploy the BolaWrap when the circumstances perceived by the officer indicate that:
>
> > a. An individual needing to be detained or controlled indicates through words or action that he or she will resist arrest, or will not voluntarily comply with lawful orders; or,
> >
> > b. The individual has demonstrated, by words or action, an intention to be violent or physically resist, and reasonably appears to present the potential to harm officers, himself/herself or others.
>
> **Note:** The BolaWrap shall not be used to apprehend an individual who is merely fleeing a pursuing officer, without other known circumstances or factors.

## B.   The Individual Defendants Caused the Company to Issue Materially Misleading Statements

29.   On April 29, 2020, the Individual Defendants caused Wrap to announce its first quarter 2020 financial results in a press release that stated, in relevant part:

**First Quarter and Recent Operational Highlights**:

- In February, began field testing BolaWrap with hundreds of officers in the Los Angeles Police Department (LAPD), the third largest police department in the U.S. with more than 9,000 sworn officers

- Received new orders for BolaWraps from police agencies in California, Missouri, Illinois, Virginia, Louisiana, Maryland, Minnesota, and Washington during March 2020

- Shipped international purchase orders for 200 BolaWraps and 2,000 cartridges and accessories

- Q1 international shipments raise the total countries receiving BolaWrap products to 19

30.     The same day, Wrap held a conference call with investors and analysts to discuss the reported first quarter 2020 financial results.  During the call, the Wrap executives stated that the LAPD had extended its field trial, purportedly due to complications caused by coronavirus. Specifically, defendant Smith stated:

> As many of you are aware, LAPD began field testing the BolaWrap in February of this year. 200 BolaWraps have been circulating among approximately 1,100 trained officers throughout L.A. City. As of today, they are a little over two-thirds of the way through their original 90-day trial period, however given what the complications the department has faced from the coronavirus, we expect that they will likely extend the field trial and we will be more than happy to continue to support the department.

31.     Similarly, defendant Rothans stated:

> Many agencies across the U.S. are only responding to emergency calls and not routine calls, which means as supposedly being proactive and maybe encountering somebody self initiated activities for somebody that's suffering from mental health crisis, somebody under the influence, now they're encouraged to stay away from that individual. So, that does limit the use and we've actually seen that even in LAPD's trial, but this of course is a limited period of time.

32.     The above statements identified in ¶¶ 29-31 were materially misleading because they failed to disclose: (1) that there were limited instances in which Wrap's BolaWrap could potentially be used because it requires a minimum of 10 feet between the officer and the suspect; (2) that, as a result, the BolaWrap was reasonably unlikely to be effective in most situations; and (3) that the LAPD sought extensions of the pilot program because they needed a larger sample size to assess the effectiveness of the BolaWrap.

**C.     The Truth Begins to Emerge But The Individual Defendants Cause the Company to Continue Issuing Materially Misleading Statements**

33.     On July 22, 2020, White Diamond Research published a report alleging that the BolaWrap had limited use in the field and therefore Wrap has a very small total addressable market.  In a report entitled "Wrap Technologies Batman Device is

Mostly Impractical in the Real World - $3 Price Target," White Diamond Research stated, in relevant part:

> [T]he BolaWrap is an impractical device with a limited use-case for law enforcement. As the tether extends 8 feet when fired, it requires at least 4 feet on either side of the target to extend properly, and a minimum of 10 feet of further separation between the officer and the target.
>
> *      *      *
>
> We've spoken with many police officers asking if they would ever use the BolaWrap. Many have told us that using this device would be in such rare situations, that it would be hard to use.
>
> The only plausible application of the device appears to be during street stops. Which are when a police officer stops a citizen on the street to ask questions or ask to conduct a search. According to the US Department of Justice . . . only ~1.0% of police to public contact takes place during street stops. Even more extreme, is that only 4.1% . . . of the altercations typically lead to an arrest. And this is further narrowed by the subsegment already being served by many other devices.
>
> *      *      *
>
> BolaWrap's TAM (Total Addressable Market) is very small. Lots of space is needed to successfully execute the device. . . . Most importantly, the device is only being marketed for the use on the mentally ill . . . .
>
> The combination of both a limited target market and the device's impracticality in most environments points to a significant limitation for the TAM. With most mental health episodes taking place domestically, police department demand and resulting sales are likely to remain constrained.

34.     Moreover, the report alleged that it was likely Wrap did not secure a contract with the LAPD.  Specifically, it stated:

> The Los Angeles Police Department ("LAPD") started a 90 day field trial with the BolaWrap in February of this year. At the time, this was a big deal, and was parroted a lot in the media in December/January right before the field trial. However, after January, the BolaWrap hasn't been mentioned by the media with respect to the LAPD.
>
> *      *      *
>
> At this point, it has been three months since WRTC's earnings call where Smith said the LAPD field trial is two-thirds finished. If the LAPD really felt a strong need for it, we believe the deal would have been announced by now. Since it hasn't been announced, then the clear implication is that it appears that LAPD decided not to make the purchase, or at least one that matters.

35.     On this news, the Company's share price fell $0.55, or 4.6%, to close at $11.34 per share on July 22, 2020, on unusually heavy trading volume.

36.     On July 30, 2020, Wrap held a conference call with investors and analysts to discuss the second quarter 2020 financial results.  During the call, defendant Norris assured that the "LAPD trained about 1,100 officers and they do have 200 devices in the field 24 hours a day with those 1,100 officers."

37.     During the same call, defendant Smith claimed that Wrap "continued to receive positive feedback from the LAPD," which had sought extensions for the field testing program purportedly because they "like[d] the product."  Specifically, he stated, in relevant part:

> There is one large department within the U.S. that we've been undergoing trials with and that is the Los Angeles Police Department.
>
> When this program first started, we initially thought that the trial period would last approximately 90 days. However, with optional extensions – periods built in the agreement, some of which have already been exercised. There was the potential for this trial to last for upwards of one year. Bear in mind, those terms were discussed before the Coronavirus began to impact the U.S. in earnest and therefore, they are subject to change.
>
> The current extension is set to end in August, but it is possible and most likely we will see another extension exercised. I am fully aware that humans are risk adverse beings. And so, there is a natural tendency to fill the void left by uncertainty with negative speculations. So, let me try to put some of those at ease. Extensions are a very good thing.
>
> **If LAPD didn't like the product, they wouldn't be asking for extensions, and we have continued to receive positive feedback from them.**
>
> To conduct this trial, LAPD had to train 1,100 officers on the BolaWrap. They committed approximately 8,800 hours to training which is equivalent to four man years that's a massive investment on their part. The opportunity cost of pulling that many officers out of rotation and into training should not be discounted. They've committed substantial resources towards this project. So rest assured they are spending the time that they believe is adequate to give the BolaWrap an honest and thorough evaluation.

38.     The above statements identified in ¶¶ 36-37 were materially misleading because they failed to disclose: (1) that there were limited instances in which Wrap's BolaWrap could potentially be used because it requires a minimum of 10

feet between the officer and the suspect; (2) that, as a result, the BolaWrap was reasonably unlikely to be effective in most situations; (3) that the LAPD sought extensions of the pilot program because they needed a larger sample size to assess the effectiveness of the BolaWrap; (4) that the LAPD had not found the BolaWrap to be useful or effective during its 180-day pilot program; and (5) that, as a result, Wrap had not received positive feedback from the LAPD about the BolaWrap and therefore it was unlikely that the Company would secure a sizeable contract with the LAPD.

39.    The truth continued to emerge on August 25, 2020 after the market closed when *Los Angeles Times* reported that the LAPD sought a 180-day extension of the program to continue evaluating the device.  The article, entitled "LAPD will keep testing BolaWrap, a device meant to immobilize suspects from a distance," stated:

> Los Angeles police will continue testing a tether restraint designed to help immobilize suspects from a distance — known as the BolaWrap — after an initial six-month pilot program produced too little data to gauge the tool's overall effectiveness.

> At the department's request, the Police Commission unanimously granted a 180-day extension to the program during its meeting Tuesday morning.

> Since the initial 180-day pilot began in February, LAPD officers have used the BolaWrap a total of nine times. It was deemed "effective" in six instances.

> According to an LAPD report on those incidents provided to the commission, successful deployments helped take various suspects into custody, including a naked man running through traffic, a suspect wielding a pipe, a suspect with a knife, and an arson suspect.

> The devices were ineffective in one incident in which a suspect was up against a fence, in another where a suspect wore a very a large, bulky coat, and another in which the officer who fired the tether missed the suspect, the report said.

> Deputy Chief Martin Baeza told the commission that the department hoped to gather data from more deployments in the coming months to help determine whether to keep using the BolaWrap.

He said the devices were meant to assist officers in bringing potentially dangerous situations to an end without using more deadly force, and that he remained optimistic they could serve that purpose.

Baeza said the LAPD was also working with the manufacturer of the BolaWrap, which provided 200 devices for testing, to see if improvements might be made to make the devices more effective.

40.     On this news, the Company's share price fell $0.50, or 5.7%, to close at $8.27 per share on August 27, 2020, on unusually heavy trading volume.

41.     On September 3, 2020, Wrap participated in the LD 500 Virtual Conference.  During the presentation, defendant Smith stated, in relevant part:

We're used in over 210 agencies around the United States, the largest being so far the Los Angeles Police Department, or LAPD. They've trained 1,100 officers and have over 200 devices out on the street. They are about halfway through their field trial, they'll be wrapping that up in early February of next year. And so far they've had great feedback from the officers and their uses so far.

42.     On September 9, 2020, Wrap participated at the 9th Annual Gateway Conference, during which defendant Smith made substantially similar statements as identified in ¶ 41.

43.     The above statements identified in ¶¶ 41-42 were materially misleading because they failed to disclose: (1) that there were limited instances in which Wrap's BolaWrap could potentially be used because it requires a minimum of 10 feet between the officer and the suspect; (2) that, as a result, the BolaWrap was reasonably unlikely to be effective in most situations; (3) that the LAPD sought extensions of the pilot program because they needed a larger sample size to assess the effectiveness of the BolaWrap; (4) that the LAPD had not found the BolaWrap to be useful or effective during its 180-day pilot program; and (5) that, as a result, Wrap had not received positive feedback from the LAPD about the BolaWrap and therefore it was unlikely that the Company would secure a sizeable contract with the LAPD.

**D.    The Truth Fully Emerges**

44.    On September 23, 2020, White Diamond Research published a report entitled "Wrap Technologies: Disastrous LAPD BolaWrap Pilot Program Results, No Evidence These Have Been Communicated to Investors."  The report alleged that, despite previously touting the LAPD pilot program, Wrap failed to disclose the key findings from the initial 180-day testing period because it was "bad news." Specifically, the report stated, in relevant part:

> The company's management has seemingly failed to disclose, however, a key milestone failure from an LAPD report filed after the six-month trial program finished on 8/25/20. We found this report through our continued research on the company. There isn't any evidence that company executives have referenced or mentioned the LAPD report. This is the only comprehensive in-field study that has been done on the BolaWrap. So why haven't the results been released to investors? It's bad news.

> Over a six-month period, 200 BolaWrap devices in the hands of 1,100 LAPD officers in the field were only used nine times, and only worked once. On an annualized basis, this comes to each BolaWrap is only used 0.09 times per year. Or, once every 11 years. At least 191 BolaWraps weren't used at all in the pilot program, they were just sitting there collecting dust. We believe this was about the worst result that could've happened from the program. The only way it could've been worse, is if the BolaWrap didn't work at all.

45.    The report described the nine incidents in which the BolaWrap had been used, thereby highlighting its limited utility.  It stated, in relevant part:

> The nine incidents of utilization are described in the report. It says that the number of incidents where the device was effective was six times. But looking at it closely, the BolaWrap did what it's supposed to do, as shown in the WRTC demonstration videos, only once.

> Analyzing each of the incidents:

> 1. A naked man was running in and out of traffic. The BolaWrap was deployed, it hit him in the legs but didn't wrap. This made the suspect take a fighting stance. An officer deployed his baton on the suspect, and he was taken into custody without further incident. This incident is marked as "effective" but it really wasn't. It didn't wrap around and disable the suspect but in fact made him more hostile as he took a fighting stance. The officer had to use force with his baton, which could've been used without the BolaWrap and likely end up with the same result.

> 2. A call came in to report a male with a mental illness. The BolaWrap wrapped around the suspect but he was wearing a

"puffy jacket" and he immediately pulled his arms free. This incident was marked "ineffective".

3. A call came in to report an ADW (Assault with a Deadly Weapon) suspect. Officers observed the suspect with a pipe in his hands. The officers told the suspect to drop it, but he wouldn't comply. First, the 40mm Less-Lethal Launcher was used to strike the suspect but had no effect. Then the BolaWrap was deployed at the suspect's legs. It didn't wrap around his legs, but the suspect immediately complied afterwards. This incident was marked "effective" because no additional force was needed after the BolaWrap was deployed. But again, it wasn't really effective because it didn't do what it's supposed to do, which is wrap around a suspect.

4. A call came in to report an ADW suspect with a knife. The suspect failed to comply with officers' commands. The BolaWrap was deployed at the suspect's legs and successfully wrapped around him, stopping his advancement. This was the only time out of these nine utilizations that the BolaWrap successfully "wrapped" a suspect.

5. Officers were in pursuit of a suspect. The BolaWrap was shot at the suspect's legs. Again, it didn't wrap around the suspect's legs, but it startled the suspect and he was taken into custody. This was marked "effective", but in our opinion it wasn't. Again, the BolaWrap didn't work like it's supposed to - it didn't wrap.

6. A man was disturbing the peace. The BolaWrap was deployed at the suspect's legs. It hit the suspect's legs but didn't wrap around it completely, and he stepped out of the tether. The officers then utilized a team takedown to take the suspect into custody. This was marked "effective" as it stopped the suspect from walking away. This is more effective than the other times, because he had to actually step out of the tether, which slowed him down. But still, it didn't wrap completely around his legs.

7. A call came in of an arson suspect. The BolaWrap was deployed at the suspect's legs, it hit him in the knee but didn't wrap. He was stunned by the impact, and was taken into custody without further incident. Because there wasn't further incident, it was marked effective, but in reality it was another fail.

8. A call came in of a family dispute. The suspect was armed with a large stick. The BolaWrap was shot at his arms, but didn't wrap, possibly because it hit a fence behind the suspect. The officers then utilized a 40mm Less Lethal Launcher and the suspect was taken into custody. This was marked as ineffective because it didn't wrap and another tool was necessary to take the suspect into custody.

A suspect refused to comply with officers' orders and the BolaWrap was deployed. It missed the suspect. Therefore, it was deemed ineffective.

46.     On this news, the Company's share price fell $2.07, or 25%, close at $6.07 per share on September 23, 2020, thereby damaging investors.

**E.     The Individual Defendants Caused Wrap to Issue a Materially Misleading Proxy Statement**

47.     On April 20, 2020, defendants Cohen, Kinsella, Norris, Parris, and Walker issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held on June 5, 2020.   In the proxy statement, these five defendants solicited stockholder votes in favor of three management proposals, including: (i) a proposal to elect Cohen, Kinsella, Norris, Parris, and Walker issued to new terms as directors; and (ii) a proposal to amend the 2017 Equity Compensation Plan (the "2017 Plan") to increase the number of shares authorized for issuance thereunder by 1.9 million shares.

48.     The proxy statement disclosed that the Board had determined that defendants Cohen and Norris were not independent.

49.     Regarding risk assessment, the proxy statement stated, in relevant part:

> Management, in consultation with outside professionals, as applicable, identifies risks associated with the Company's operations, strategies and financial statements. Risk assessment will also be performed through periodic reports received by the Audit Committee from management, counsel and the Company's independent registered public accountants relating to risk assessment and management. Audit Committee members meet privately in executive sessions with representatives of the Company's independent registered public accountants. The Board also provides risk oversight through its periodic reviews of the financial and operational performance of the Company.

50.     The 2017 Plan authorizes the issuance of shares of the Company's common stock for equity awards to Wrap's employees and directors.   As of April 9, 2020, a total of 390,068 shares remained available for future grant pursuant to the plan.   Equity pursuant to the 2017 Plan is effectively awarded at the discretion of the Board, according to the proxy statement:

> Administration
>
> The Compensation Committee of the Board administers the 2017 Plan, which permits the granting of equity awards to purchase up to 4.1

million shares of our Common Stock, which number will increase to 6 million shares of our Common Stock on the day of the Annual Meeting, subject to the receipt of stockholder approval of the Plan Amendment.

The 2017 Plan permits the Compensation Committee to grant one of four types of equity incentive awards: (i) stock options, (ii) shares of Common Stock, (iii) restricted stock awards, and (iii) restricted stock units.

The Compensation Committee may delegate to a committee of one or more members of the Board the authority to grant or amend awards to participants other than senior executives of the Company who are subject to Section 16 of the Exchange Act, or employees who are "covered employees" within the meaning of Section 162(m) ("Section 162(m)") of the Internal Revenue Code (the "IRS Code"). The Compensation Committee includes at least two directors, each of whom qualifies as a non-employee director pursuant to Rule 16b-3 of the Exchange Act, and an "outside director" pursuant to Section 162(m).

The Compensation Committee, or a committee delegated by the Compensation Committee, will have the exclusive authority to administer the 2017 Plan, including the power to determine eligibility, the types and sizes of awards, the price and timing of awards and the acceleration or waiver of any vesting restriction, provided that the Compensation Committee will not have the authority to accelerate vesting or waive the forfeiture of any performance-based awards.

51. The proxy statement solicited shareholder approval of an amendment to the 2017 Plan to increase the number of shares of common stock reserved for issuance thereunder by 1.9 million shares. If approved, the total number of shares reserved for issuance would be 2,290,068, which represents 7.6% of the Company's common stock outstanding as of April 9, 2020.

52. The proxy statement was materially misleading for the following reasons: (i) it misrepresented the Board's activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation. A reasonable shareholder would have found the truth to be material when deciding to vote for or against these proposals.

53. On June 8, 2020, Wrap filed a Form 8-K with the SEC disclosing the results from the votes on the proposals contained in the proxy statement. In

particular: (i) Cohen, Kinsella, Norris, Parris, and Walker were reelected to new terms as directors; and (ii) the amendment to the 2017 Plan was approved by stockholders.   The reelection of these five directors and the approval of the amendment to the 2017 Plan based on the misleading statements contained in the proxy statement and other public filings was a fundamental link in these directors' continued breaches of fiduciary duties and the continued enrichment of at the expense of the Company's unaffiliated stockholders.

**F.** **Defendants Barnes and Rothans Sold More than $250,000 in Wrap Stock While in Possession of Material Non-Public Information**

Barnes

54.    Defendant Barnes is the Company's CFO with a highly sophisticated understanding of the Company's results and their import.

55.    As set forth herein, defendant Barnes possessed material negative information which he knew was being concealed from investors.  Defendant Barnes consciously acted to exploit his knowledge by selling over $215,000 of Wrap stock to his substantial benefit, as follows:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 6/11/2020 | 6,000 | $6.73 | $40,380 |
| 7/1/2020 | 6,000 | $10.50 | $63,000 |
| 8/3/2020 | 6,000 | $10.04 | $60,240 |
| 9/1/2020 | 6,000 | $8.94 | $53,640 |
|  | **24,000** |  | **$217,260** |

56.    Defendant Barnes thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

Rothans

57.    Defendant Rothans is the Company's CSO with a highly sophisticated understanding of the Company's results and their import.

58.     As set forth herein, defendant Rothans possessed material negative information which he knew was being concealed from investors.    Defendant Rothans consciously acted to exploit his knowledge by selling 4,800 shares of Wrap stock at $8.61 per share for a benefit of approximately $41,328.

59.     Defendant Rothans thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

## VI.    DAMAGES TO THE COMPANY

60.     As a direct and proximate result of the Individual Defendants' conduct, Wrap has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

(a)     Legal fees incurred in connection with the Securities Class Action;

(b)     Any funds paid to settle the Securities Class Action; and

(c)     Costs incurred from compensation and benefits paid to the defendants who have breached their fiduciary duties to Wrap.

61.     In addition, Wrap's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

62.     The actions complained of herein have irreparably damaged Wrap's corporate image and goodwill. For at least the foreseeable future, Wrap will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Wrap's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

63.     Plaintiff brings this action derivatively in the right and for the benefit of Wrap to redress injuries suffered, and to be suffered, by Wrap as a direct result of

breaches of fiduciary duty by the Individual Defendants, violations of Section 14(a) of the Exchange Act, insider trading, and contribution for violations of Section 10(b) of the Exchange Act.  Wrap is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

64.     Plaintiff will adequately and fairly represent the interests of Wrap in enforcing and prosecuting its rights.

65.     Plaintiff has continuously been a shareholder of Wrap at times relevant to the wrongdoing complained of and is a current Wrap shareholder.

66.     When this action was filed, Wrap's Board consisted of defendants Cohen, Kinsella, Norris, Parris, and Walker.  Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Defendant Cohen**

67.     Cohen is the Executive Chair and founder of Wrap, and therefore is not independent under NASDAQ listing rules.  He founded the Company with defendant Barnes and Elwood Norris, the Company's Chief Technology Officer and father of defendant Norris.

68.     He also founded, owns, and serves as the Managing Partner of V3 Capital Partners, LLC, which provides certain investor, shareholder, and marketing services to Wrap and provided assistance to the Company in a qualified financing.

**Defendant Norris**

69.     Norris is the former Company's CEO, and therefore is not independent under NASDAQ listing rules.  As an employee, Norris derives substantially all of his income from his employment with Wrap, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.  Moreover, as former CEO and as alleged herein, Norris

personally issued the misleading statements alleged herein. As a result, Norris would be interested in a demand regarding his own wrongdoing and demand is futile as to him.

**Defendants Kinsella, Parris, and Walker**

70. Kinsella, Parris, and Walker served as members of the Audit Committee at all relevant times. As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations. As alleged herein, Kinsella, Parris, and Walker failed to ensure the integrity of the Company's internal controls, allowing the materially misleading financial statements to be disseminated in Wrap's SEC filings and other disclosures. Thus, Kinsella, Parris, and Walker breached their fiduciary duties and are not interested, and demand is excused as to them.

**Defendants Cohen, Kinsella, Norris, Parris, and Walker**

71. Cohen, Kinsella, Norris, Parris, and Walker could not disinterestedly consider a demand to action in connection with the misleading proxy statement issued in April 2020. These five directors issued the proxy statement knowing that representations made in the Company's SEC filings and other disclosures were misleading with respect to the efficacy of BolaWrap and the status of the LAPD Pilot Program, and they did not disclose the same prior to the issuance of the proxy statement or the shareholder vote in June 2020. Had these five directors truthfully and completely revealed the misleading nature of the Company's public statements, Cohen, Kinsella, Norris, Parris, and Walker would not have been reelected as directors and the amendments to the 2017 Plan would not have been approved. As a result, Cohen, Kinsella, Norris, Parris, and Walker would be interested in a demand regarding the misleading proxy statement, and demand is excused as to them on that basis as well.

## COUNT I

**Against Defendants Norris, Smith, Barnes, Rothans, and Thomas for Breach of Fiduciary Duty**

72.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

73.     Defendants Norris, Smith, Barnes, Rothans, and Thomas each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Wrap's business and affairs, particularly with respect to issues as fundamental as public disclosures.

74.     The conduct of Defendants Norris, Smith, Barnes, Rothans, and Thomas set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  Defendants Norris, Smith, Barnes, Rothans, and Thomas intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Wrap.

75.     In breach of their fiduciary duties owed to Wrap, defendants Norris, Smith, Barnes, Rothans, and Thomas willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

76.     In particular, defendants Norris, Smith, Barnes, Rothans, and Thomas knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

77.     As a direct and proximate result of the  breaches of their fiduciary obligations by defendants Norris, Smith, Barnes, Rothans, and Thomas, Wrap has sustained and continues to sustain significant damages.  Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

**Against Defendants Cohen, Kinsella, Norris, Parris, and Walker for Breach of Fiduciary Duty**

78.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

79.     Defendants Cohen, Kinsella, Norris, Parris, and Walker each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Wrap's business and affairs, particularly with respect to issues as fundamental as public disclosures.

80.     The conduct of defendants Cohen, Kinsella, Norris, Parris, and Walker set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  Defendants Cohen, Kinsella, Norris, Parris, and Walker intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Wrap.

81.     In breach of their fiduciary duties owed to Wrap, defendants Cohen, Kinsella, Norris, Parris, and Walker willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

82.     In particular, defendants Cohen, Kinsella, Norris, Parris, and Walker knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

83.     As a direct and proximate result of the breaches of their fiduciary obligations by defendants Cohen, Kinsella, Norris, Parris, and Walker, Wrap has sustained and continues to sustain significant damages.  Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## **COUNT III**

**Against Defendants Cohen, Kinsella, Norris, Parris, and Walker for Violations of Section 14 of the Exchange Act**

84.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

85.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.  Specifically, the Company's proxy statement filed on April 20, 2020 violated § 14(a) and Rule 14a-9 because: (i) it misrepresented the Board's activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation.

86.     In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

87.     The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement.  The proxy statement solicited and obtained shareholder votes for: (i) director nominees; (ii) amendments to the 2017 Plan; and (iii) ratification of appointment of independent auditor.  The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

88.     The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## COUNT IV

### Against Barnes and Rothans – *Brophy* Claim

89.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

90.    As alleged above, Barnes and Rothans are fiduciaries of Wrap, possessed material, non-public information of Wrap, and used that information improperly to profit from sales of Wrap stock. When Barnes and Rothans directed the stock sales set forth above, they were motivated to do so, in whole or in part, by the substance of the material, non-public information they possessed, and they acted with scienter.

91.    When Barnes and Rothans sold their Wrap stock, they knew that the investing public was unaware of the negative material information that they possessed. They also knew that if the information were disclosed, the market price of Wrap stock would be significantly lower. Barnes and Rothans timed their stock sales to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock they sold. They thereby benefitted by misappropriating Wrap's non-public information.

92.    Plaintiff has no adequate remedy at law.

## COUNT V

### Against Defendants Norris, Smith, Barnes, Rothans, and Thomas for Contribution for Violations of Sections 10(b) and 21D of the Exchange Act

93.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

94.    Defendants Norris, Smith, Barnes, Rothans, and Thomas are named as defendants in related securities class action. The conduct of these Defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

95.    Wrap is named as a defendant in related securities class actions that allege and assert claims arising under § 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If Wrap is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

96.    As officers, directors and otherwise, defendants Norris, Smith, Barnes, Rothans, and Thomas had the power or ability to, and did, control or influence, either directly or indirectly, Wrap's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

97.    Defendants Norris, Smith, Barnes, Rothans, and Thomas are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

98.    Defendants Norris, Smith, Barnes, Rothans, and Thomas have damaged the Company and are liable to the Company for contribution.

99.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of Wrap, demands judgment as follows:

A.    Declaring that plaintiff may maintain this action on behalf of Wrap and that plaintiff is an adequate representative of the Company;

B.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.      Declaring that Defendants have breached their fiduciary duties to Wrap;

D.      Directing Wrap to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Wrap and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen Wrap's oversight of its disclosure procedures;

4.      a provision to control insider transactions; and

5.      a provision to permit the stockholders of Wrap to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Wrap has an effective remedy;

F.  Awarding to Wrap restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.  Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.  Granting such other and further relief as the Court deems just and proper.

### **JURY DEMAND**

100.  Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

DATED: January 22, 2021          GLANCY PRONGAY & MURRAY LLP

By:  *s/ Robert V. Prongay*

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  rprongay@glancylaw.com
Email:  prajesh@glancylaw.com

and

Benjamin I. Sachs-Michaels
712 Fifth Avenue, 31st Floor
New York, New York 10019
Telephone: (212) 935-7400
Email:  bsachsmichaels@glancylaw.com

*Attorneys for Plaintiff Jesse Lowe*

## <u>WRAP TECHNOLOGIES, INC. VERIFICATION</u>

I, Jesse Lowe, do hereby verify that I am a holder of common stock of Wrap Technologies, Inc. and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Shareholder Derivative Complaint (the "Complaint"). I have reviewed and authorized the filing of the Complaint. All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge, and with respect to the remainder of the averments, are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: ___1/21/2021_____

DocuSigned by:

*Jesse Lowe*
475BEABD99C24A5...

Jesse Lowe